O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| KRISTINE BAKER,<br><br>                    Plaintiff,<br><br>          v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>                    Respondent. | Case No. CV 15-02188-DFM<br><br>MEMORANDUM OPINION AND ORDER |

Kristine Baker ("Plaintiff") appeals from the final decision of the Administrative Law Judge ("ALJ") denying her applications for Social Security Child's Insurance Benefits ("CIB")[1] and Supplemental Security Income ("SSI"). For the reasons discussed below, the Commissioner's decision is reversed and this decision is remanded.

---

[1] CIB is available for a disabled child of a person who is deceased or drawing Social Security disability or retirement benefits. 42 U.S.C. § 402(d); 20 C.F.R. § 404.350(a). To be eligible for CIB, an applicant who is 18 years old or older must have become disabled before age 22. 42 U.S.C. § 402(d); 20 C.F.R. § 404.350(a)(5).

# I.

## BACKGROUND

Plaintiff filed an application for SSI on June 10, 2012, and an application for CIB on June 27, 2012. Administrative Record ("AR") 105, 117, 196-208. After her applications were denied, she requested a hearing before an ALJ. AR 166-68. The ALJ held a hearing and heard testimony from Plaintiff, who was represented by counsel, as well as a vocational expert ("VE"). AR 65-104. In a written decision issued on July 19, 2013, the ALJ denied Plaintiff's claims for benefits. AR 30-38. In reaching her decision, the ALJ found that Plaintiff had the severe impairment of bipolar disorder, AR 32-33, and that despite her impairment, she retained the residual functional capacity ("RFC") to

> perform the full range of work at all exertional levels but with the following nonexertional limitations: simple, repetitive tasks not requiring a rapid paced, high production work quota; work would be out of the public eye, e.g. only incidental contact with the public; can work side-by-side with coworkers, but with minimal verbal collaboration, e.g. can report to supervisors and take instructions, but the majority of the job should be performed independently.

AR 35. Based on the VE's testimony, the ALJ found that Plaintiff could perform two jobs that existed in significant numbers in the national economy. AR 37-38. She therefore concluded that Plaintiff was not disabled. AR 38.

Plaintiff requested review of the ALJ's decision. AR 24. After considering additional evidence, the Appeals Council denied Plaintiff's request on February 9, 2015.[2] AR 8-12. This action followed.

---

[2] Social Security Administration regulations "permit claimants to submit new and material evidence to the Appeals Council and require the Council to

## II.

## ISSUES PRESENTED

Plaintiff argues that the ALJ (1) improperly rejected the opinions of Plaintiff's treating psychiatrist, Dr. Richard M. Deamer; (2) formulated an RFC assessment that was unsupported by substantial evidence and posed an "incomplete and inaccurate" hypothetical to the VE; (3) failed to resolve a potential conflict between the Dictionary of Occupational Titles ("DOT") and the VE's testimony; (4) improperly discredited Plaintiff's testimony; and (5) improperly assessed and rejected the third-party oral and written testimony. Joint Stipulation ("JS") at 2-3. The Court addresses these issues in an order different from that followed by the parties.

## III.

## DISCUSSION

**A.    The ALJ's Rejection of Dr. Deamer's Opinion**

Plaintiff contends that the ALJ failed to provide specific and legitimate reasons for rejecting the opinions of her treating psychiatrist, Dr. Deamer. JS at 3-12, 24-26. For the reasons discussed below, remand is not warranted on this ground.

### 1.     Applicable Law

Three types of physicians may offer opinions in Social Security cases:

---

consider that evidence in determining whether to review the ALJ's decision, so long as the evidence relates to the period on or before the ALJ's decision." Brewes v. Comm'r of Soc. Sec. Admin., 682 F.3d 1157, 1162 (9th Cir. 2012); see also §§ 404.970(b), 416.1470(b). "[W]hen the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence." Brewes, 682 F.3d at 1163; accord Taylor v. Comm'r of Soc. Sec. Admin., 659 F.3d 1228, 1232 (9th Cir. 2011).

those who treated the plaintiff, those who examined but did not treat the plaintiff, and those who did neither. See 20 C.F.R. §§ 404.1527(c), 416.927(c); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (as amended Apr. 9, 1996). A treating physician's opinion is generally entitled to more weight than that of an examining physician, which is generally entitled to more weight than that of a nonexamining physician. Lester, 81 F.3d at 830. When a treating physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing reasons." See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (citing Lester, 81 F.3d at 830-31). Where such an opinion is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citation omitted). Moreover, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). The weight accorded to a physician's opinion depends on whether it is consistent with the record and accompanied by adequate explanation, the nature and extent of the treatment relationship, and the doctor's specialty, among other things. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

## 2.   Relevant Facts

In January 2012, Dr. Deamer noted that Plaintiff, who was then 17 years old, complained of "bipolar mood switches for at least 2-3 years," and had been on "a plethora of medications that have helped" that condition. AR 266. He noted that all of her medication was "relatively well-tolerated."[3] Dr.

---

[3] Dr. Deamer also noted that Plaintiff had previously required "psychiatric hospitalization." AR 266. But Plaintiff later informed the Social

4

Deamer's objective observation was that Plaintiff was an "[a]lert/interactive young woman in no distress, [with] good eye contact and social relatedness and in no obvious distress presently." Id. He diagnosed generalized anxiety disorder and bipolar disorder in "partial remission." Id. Dr. Deamer prescribed clonazepam, ziprasidone, lithium, haloperidol, and nortriptyline,[4] and he advised her to return to the office in 6 weeks. Id.

In April 2012, Dr. Deamer noted that Plaintiff had "read my initial notes/commentary" and "seemed in agreement with most of my findings." AR 267. He noted that Plaintiff's "[m]ood seems stable" and that she seemed

---

Security Administration that she had never been psychiatrically hospitalized, although her sister had been and they both saw Dr. Deamer. AR 109. Nothing else in the record indicates that Plaintiff has ever been hospitalized for her psychological condition. In the Joint Stipulation, Respondent points out this discrepancy and argues that Dr. Deamer had "conflated Plaintiff's condition with the more serious condition of her sister, Andrea." JS at 16-17 n. 9. In her Reply, Plaintiff did not contest that assertion. See JS at 25 (noting "a possible discrepancy about whether [P]laintiff was hospitalized"). As such, Dr. Deamer's notation that Plaintiff was at some point psychiatrically hospitalized appears to have been a mistake.

[4] Clonazepam is a benzodiazepine used to control seizures and relieve panic attacks. Clonazepam, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682279.html (last updated Sept. 15, 2016). Ziprasidone is an antipsychotic used to treat symptoms of schizophrenia as well as episodes of mania in people with bipolar disorder. Ziprasidone, MedlinePlus, https://medlineplus.gov/druginfo/meds/a699062.html (last updated Feb. 15, 2016). Lithium is an antimanic agent used to treat and prevent episodes of mania in people with bipolar disorder. Lithium, MedlinePlus, https://medlineplus.gov/druginfo/meds/a681039.html (last updated Mar. 15, 2014). Haloperidol is a conventional antipsychotic used to treat psychotic disorders. Haloperidol, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682180.html (last updated May 16, 2011). Nortriptyline is a tricyclic antidepressant used to treat depression. Nortriptyline, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682620.html (last updated Dec. 15, 2014).

to be "doing better with her affective status than" her sister, who also suffered from bipolar disorder. Id. Dr. Deamer noted that Plaintiff complained of sleep terrors, which could be a side effect of her medication. Id. His objective observation was that Plaintiff was an "[a]lert/interactive young woman in no distress." Id. He diagnosed "bipolar disorder, in remission," noted that her "meds [were] OK for now," and recommended that she follow up with him in July. Id.

In July 2012, Dr. Deamer noted that Plaintiff's "[m]ood seems stable" and she was applying for disability. AR 342. He noted that she had "yet to finish high school" and would probably "go[] for her GED instead." Id. His objective observation was that Plaintiff was an "[a]lert/interactive young woman in no obvious distress." Id. He diagnosed bipolar disorder in "partial remission" and noted that her meds were "OK for now." Id. Also in July 2012, Dr. Deamer wrote a letter to the Social Security Administration stating that Plaintiff "will need help with SSI and will be unable to function in any kind of vocational status for six months." AR 292.

In September 2012, Dr. Deamer noted that Plaintiff reported being "subject to more manic episodes of late" and she was "wondering if '[her] lithium is high enough.'" AR 309. He noted that because Plaintiff was taking "only 900 mg/day, divided dosages, and tends to take irregularly, this might be problematic." Id. His objective observation was that Plaintiff was an "[a]lert/interactive young woman in no apparent distress." Id. He diagnosed bipolar disorder in "partial remission," refilled her lithium prescription, and stated that he would "call regarding lithium levels and increase to 1300 mg/day if needed."AR 310.

In October 2012, Dr. Deamer noted that "[o]verall," Plaintiff's "affective status seems [within normal limits] for a young adult severely affected with bipolarity," and that she was "still subject to situational types of stress, for

6

instance a family dog's illness" and she was "prone to panic dysphoria on shopping trips." AR 310. He noted that Plaintiff had been "turned down for disability but will be appealing in the future." Id. He prescribed diazepam[5] to help with Plaintiff's panic attacks. AR 310-11.

In January 2013, Dr. Deamer wrote a letter to the Social Security Administration, stating that he believed that Plaintiff was "unable to hold down any vocational status at this time due to the nature of her mood disorder." AR 344. He wrote that Plaintiff was "unable to work for one year, but will be assessed periodically during that time frame and, if able, will be released for work accordingly." Id.

In February 2013, Dara Goosby, a psychologist, reviewed Plaintiff's medical records and completed a Psychiatric Review Technique ("PRT") assessment and mental-RFC assessment. AR 146-51. In the PRT assessment, Dr. Goosby found that Plaintiff had moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no repeated episodes of decompensation, each of extended duration. AR 147. After summarizing the medical evidence, Dr. Goosby concluded that Plaintiff "appears capable of simple work with limited public contact in order to minimize the stress of work and potential triggering of [symptoms]." Id.

In the mental RFC assessment, Dr. Goosby found that Plaintiff did not have any understanding or memory limitations. AR 150. Dr. Goosby believed that Plaintiff was moderately limited in her ability to carry out detailed instructions, complete a normal workday and workweek without interruptions

---

[5] Diazepam, or Valium, is used to relieve anxiety, muscle spasms, and seizures and to control agitation caused by alcohol withdrawal. Diazepam, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682047.html (last updated Sept. 15, 2016).

from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and interact appropriately with the general public. AR 150-51. She was "not significantly limited" in her ability to carry out very short and simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, work in coordination with or in proximity to others, make simple work related decisions, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers, among other things. Id.

Dr. Goosby concluded that Plaintiff was "limited to carrying-out . . . simple 1-2 step tasks in order to limit the stress of work and potential triggering of [psychiatric symptoms] over an 8hr day and 40 hr week." AR 150. She also opined that Plaintiff was "to have limited contact with the public to minimize the stress of work and due to anxiety [symptoms]." AR 151.

In March 2013, Dr. Deamer wrote a letter stating that Plaintiff had suffered from bipolar disorder since age 13. AR 346. Plaintiff had "tried to find work compatible with the nature of her affective disorder, but most recently was able to work as a cashier in a local pharmacy for only 4 days 'until [her] anxiety went through the roof.'" Id. He wrote that he "ha[d] no reason to assume any other work situation, even the most straight forward, would be handled with less immobilizing distress." Id.

In June 2013, Dr. Deamer noted that Plaintiff and her sister were worried about Plaintiff's symptoms, including "issues with 'manic rage,' her tendency to lose control, punching holes in the wall, and perhaps 3x/month, '[u]nable to sleep more than 2-3 hours/night,' when slipping into this state of mind." AR 354. Dr. Deamer noted that "[o]n further inquiry, much of this seems related to the fact that [Plaintiff's sister and brother-in-law], after 13 years of a troubled marriage, still get into shouting/hollering matches over

how [Plaintiff's sister] is spending money." Id. Dr. Deamer "pointed out that expressed emotion of this sort is never well-tolerated by people with severe mental ailments, that increasing/changing medication around will not be treating the source of the problem, and that one way or the other, [the couple was] going to need to tone down the source of their discontent." Id. His objective observation was that Plaintiff was an "alert/interactive young woman in no seeming distress." Id. He diagnosed bipolar disorder in "partial remission," noted that her meds were "OK for now," and directed her to return for a follow up in October. Id.

In June 2013, Dr. Deamer completed a check-off form titled "Medical Opinion re: Ability to Do Work-Related Activities (Mental)." AR 347. Dr. Deamer opined that Plaintiff was precluded from performing most of the listed work functions for 15% or more of an 8-hour workday; those functions included, among others, remembering work-like procedures; maintaining sufficient attention and concentration to complete tasks in a timely manner; performing at a consistent pace without an unreasonable amount of rest periods; completing a normal workday without interruption from psychologically based symptoms; working in proximity to others without becoming distracted; dealing with work stress; understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; and interacting with the general public. Id. He found that Plaintiff was precluded from performing the following functions for 10 percent or more of an 8-hour workday: understanding, remembering, and carrying out very short and simple instructions; making simple work-related decisions; being aware of hazards; performing routine tasks over and over with little opportunity for diversion or interruption; and performing tasks under specific instruction. Id. Dr. Deamer also found that Plaintiff would have four episodes of decompensation, each lasting at least 2 weeks, in each 12-month period. Id.

Also in June 2013, Dr. Deamer completed a check-off form titled "Mental Residual Functional Capacity Statement." AR 349-52. In it, he opined that Plaintiff had a "chronic mental illness that has been somewhat responsive to a plethora of medications oriented to her affective status, but has never recovered full enough for serious consideration of employment/individuation." AR 349. Dr. Deamer again opined that Plaintiff was unable to perform most workplace activities for 15 percent or more of an 8-hour workday. AR 349-51. He believed Plaintiff would be "off task" for 30 percent of an 8-hour workday, would be absent from work for 5 or more days a month, and would be unable to complete an 8-hour workday for 5 or more days a month. AR 351. She would perform her job with less than 50 percent efficiency. Id. Dr. Deamer believed that Plaintiff was "heavily impacted with strong debilitating history of bipolarity, heavily medicated for same but only partially responsive to polypharmacy." AR 352. He wrote that the "[s]tress in the relationship [Plaintiff] sees at home" between her sister and her brother-in-law "tends to 'unhinge' her affective stability." Id. Dr. Deamer did "not believe [Plaintiff] will be capable of a more autonomous existence" and he opined that she was "not able to work." Id.

In July 2013, the ALJ issued her decision denying Plaintiff's claims for benefits. AR 30-38. In doing so, the ALJ accorded "little weight" to Dr. Deamer's opinions and the "most weight" to Dr. Goosby's mental-RFC assessment. AR 36.

In July 2013, just a few days after the ALJ issued her decision, Dr. Deamer wrote a letter to Plaintiff's attorney regarding the "recent changes in [Plaintiff's] medication regimen." AR 386. Dr. Deamer had "increase[d] her serum lithium regimen to 1350 mg/day while decreasing her Valium regimen," and he found that Plaintiff "seems to be responding to these changes rather well." Id. Three days later, Dr. Deamer wrote another letter to

Plaintiff's counsel, noting that Plaintiff had been "turned down for SSI." AR 387. Dr. Deamer wrote that bipolar disorder "can be very debilitating and has rendered [Plaintiff] unable to find employment." Id. He wrote that Plaintiff has been "struggling with anger and anxiety issues" and that "since [she] has been unable to flourish with an education that would enhance her odds of success, this limits her future even more." Id.

### 3. Analysis

Contrary to Plaintiff's contention, the ALJ permissibly rejected Dr. Deamer's opinions based on the conflict between his findings of "extreme limitations" in his opinions and his "relatively benign treatment notes." AR 36; see Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d 685, 692-93 (9th Cir. 2009) (finding that contradiction between treating physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting treating physician's opinion); Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (finding that treating physician's opinion was properly rejected when treatment notes "provide[d] no basis for the functional restrictions he opined should be imposed on [plaintiff]"). As the ALJ found, AR 36, Plaintiff visited Dr. Deamer only once every few months—a total of six visits—for medication refills. During those six examinations, Dr. Deamer did not record any objective findings of abnormalities; rather, he generally noted, for example, that Plaintiff was alert, interactive, and in no distress and that she had good eye contact and "social relatedness." See AR 266, 267, 342, 354. He also repeatedly noted that Plaintiff's mood was stable, AR 267, 342, and that her bipolar disorder was in remission or partial remission, AR 266-67, 342, 310, 354. On the two occasions that Plaintiff reported increased psychiatric symptoms, Dr. Deamer attributed them to either her taking her medication "irregularly," AR 309, or to her exposure to her sister's marital conflict, AR 354. Those mild findings fail to support Dr. Deamer's opinions that Plaintiff

was so disabled that she would, for example, have four episodes of decompensation, each lasting at least 2 weeks, in each 12-month period; be off-task for 30 percent of the workday; miss 5 or more days of work each month; and have significant limitations on most work functions. AR 347, 349-51. See Thomas, 278 F.3d at 957 (finding that ALJ need not accept treating physician's opinion that is "inadequately supported by clinical findings").

The ALJ also rejected Dr. Deamer's opinions because he appeared to "rely quite heavily on the subjective report of symptoms and limitations provided by" Plaintiff. AR 36. Once an ALJ properly discounts a claimant's credibility, she is generally free to disregard a physician's opinion that was premised on the claimant's subjective complaints. See Tonapetyan, 242 F.3d at 1149. And given that Dr. Deamer's treatment notes reflect essentially no abnormal objective findings, it appears that his opinions of Plaintiff's functional limitations are based primarily on Plaintiff's own account. Moreover, as discussed below in Section B, the ALJ permissibly discounted Plaintiff's subjective complaints.

Plaintiff argues, however, that "[p]atient complaints are a fully acceptable tool in assessing their condition, especially in assessing mental impairments." JS at 9-10. Indeed, the Ninth Circuit has noted, in an unpublished opinion, that "[t]o allow an ALJ to discredit a mental health professional's opinion solely because it is based to a significant degree on a patient's 'subjective allegations' is to allow an end-run around our rules for evaluating medical opinions for the entire category of psychological disorders." Ferrando v. Comm'r of Soc. Sec. Admin., 449 F. App'x 610, 612 n.2 (9th Cir. 2011). But here, Dr. Deamer failed to record any abnormal clinical findings; as such, he apparently uncritically accepted Plaintiff's subjective account of her limitations and relied on it exclusively in formulating his opinion. See Forbes v. Colvin, No. 14-05780, 2015 WL 3751817, at *5 (W.D. Wash. June 15,

2015) (distinguishing <u>Ferrando</u> and rejecting social worker's opinion when "the narrative statement [he] provided in support of the functional limitations he assessed appears to be based almost exclusively on plaintiff's self-reporting" and treatment notes were "largely devoid of observations or other objective findings that would support the level of severity of those limitations"). But in any event, even if the ALJ erred in relying on this factor, it was harmless because she provided another specific and legitimate reason for discounting Dr. Deamer's opinion. <u>See</u> <u>Stout v. Comm'r, Soc. Sec. Admin.</u>, 454 F.3d 1050, 1055 (9th Cir. 2006) (nonprejudicial or irrelevant mistakes harmless).

Remand is not warranted on this ground.

## B.   The ALJ's Credibility Determinations

Plaintiff contends that the ALJ improperly discredited her testimony and the third-party testimony of her sister, Andrea Abercrombie. JS at 50-55, 61-62. For the reasons discussed below, remand is not warranted on this ground.

### 1.   Applicable Law

To determine whether a claimant's testimony about subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis. <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the alleged pain or other symptoms alleged.'" <u>Id.</u> at 1036 (citation omitted). Once a claimant does so, the ALJ "may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 345 (9th Cir. 1991) (en banc).

If the claimant meets the first step and there is no affirmative evidence of malingering, the ALJ must provide specific, clear and convincing reasons for discrediting a claimant's complaints. <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d

13

880, 883 (9th Cir. 2006) (citing <u>Smolen v. Chater</u>, 80 F.3d 1273, 1283-84 (9th Cir. 1996)). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." <u>Brown-Hunter v. Colvin</u>, 806 F.3d 487, 493 (9th Cir. 2015) (citation omitted). The ALJ may consider, among other factors, a claimant's reputation for truthfulness, inconsistencies either in her testimony or between her testimony and her conduct, unexplained or inadequately explained failure to seek treatment or follow a prescribed course of treatment, her work record, and her daily activities. <u>Light v. Soc. Sec. Admin.</u>, 119 F.3d 789, 792 (9th Cir. 1997); <u>Smolen</u>, 80 F.3d at 1283-84 & n.8. If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." <u>Thomas</u>, 278 F.3d at 959.

Moreover, an ALJ must consider all of the available evidence in the individual's case record, including third-party statements from caregivers and siblings. SSR 06-03p, 2006 WL 2329939, at *2, 4 (Aug. 9, 2006); <u>Stout v. Comm'r, Soc. Sec. Admin.</u>, 454 F.3d 1050, 1053 (9th Cir. 2006). The ALJ may discount such testimony, however, by providing "reasons that are germane to each witness." <u>Stout</u>, 454 F.3d at 1053 (citing <u>Dodrill v. Shalala</u>, 12 F.3d 915, 919 (9th Cir. 1993)).

### 2.  Relevant Facts

In an undated disability report, Plaintiff wrote that she had been disabled since June 20, 2009, because of bipolar disorder, anxiety disorder, and depression. AR 212.

In an August 10, 2010 function report, Plaintiff wrote that she lived in an apartment with her family. AR 225. Her daily activities included cleaning her house, cooking, smoking cigarettes, feeding and watering her dogs, taking out the trash, and wiping down the counters. AR 225-27. She had no problems with personal care. AR 226. She prepared "normal food" daily, which took 15

minutes. AR 227. She traveled by walking or riding in a car; she didn't drive because of her "20/50 vision" and "anxiety." AR 228. Plaintiff could not go out alone because of her anxiety. Id.

Plaintiff shopped in stores and online for food, which would take "an hour +." Id. She often went to Walmart and PetSmart but needed someone to accompany her. AR 229. She was unable to handle money because she "fe[lt] stupid." Id. She did not spend time with others. Id. Her hobbies included reading. Id. Plaintiff had no problems getting along with people. AR 230. She could walk "short distances," pay attention for ".05 seconds," and "sometimes" finish what she started. AR 230. She could follow written instructions "okay" and spoken instructions "not very" well. Id. Plaintiff got along "fine" with authority figures. AR 231. She couldn't handle stress or changes in routine "very well." Id.

Also on August 10, 2010, Plaintiff's sister, Abercrombie, completed a third-party function report. AR 233-40. Abercrombie wrote that she lived with Plaintiff in an apartment. AR 233. Plaintiff's daily activities included helping with chores, including "simple cleaning," laundry, and washing dishes, and playing on the computer. AR 233, 235. Plaintiff also fed and watered her pets. AR 234. Plaintiff had no problem with personal care and she made sandwiches and frozen meals daily, which took about 15 minutes. AR 234-35. Abercrombie wrote that Plaintiff could not go out alone because of her anxiety and she did not drive because of her bad vision and anxiety. AR 236. Plaintiff shopped in stores, while accompanied, for food and household items once or twice a week for about an hour. Id. She was unable to count change. AR 237. Plaintiff's hobbies included reading. Id. She spent time with other people, id., but she had trouble getting along with people because of her anxiety, AR 238.

Abercrombie wrote that Plaintiff's anxiety and bipolar disorder affected her memory, concentration, understanding, and ability to complete tasks,

follow instructions, and get along with others. Id. Plaintiff could pay attention for a "very short amount of time." Id. She could follow written instructions "fairly well" but could follow spoken instructions "not well." Id. She did not get along well with authority figures and did not handle stress or changes in routine well. AR 239. Abercrombie wrote that Plaintiff dropped out of school because of her anxiety and panic attacks. AR 240.

At the July 8, 2013 ALJ hearing, Plaintiff testified that she had attended high school up to the ninth or tenth grade before stopping because of her "anxiety and anger issues." AR 70, 86. She saw a psychiatrist about "once every three months" for medication but she did not see a therapist. AR 71. At some point, Plaintiff "quit taking [her] pills all together" because she "totally forgot to take [her] meds." AR 72-73.

Plaintiff testified that she "could not do a job to save her life" and that "the thought of working scare[d] the heck out of" her. AR 71. She had panic attacks when shopping in "big stores with lots of people." AR 73. She would have manic episodes two or three times a month, during which she would stay up for 24 to 48 hours then "crash" and sleep for 12 to 16 hours. AR 79-80. For a week following such an episode, Plaintiff would get "really angry at the minutest little things," and then the cycle would repeat. AR 81-82. She could focus and concentrate for 5 minutes "at the most." AR 83. Plaintiff would lie down two to three times a day for a total of 4 to 6 hours. AR 76-77.

Plaintiff was "really good friends" with three of her neighbors. AR 74-75. She had worked as a cashier in a pharmacy for 4 days in June 2009, but she had to stop because she "could not learn how to work the register." AR 84. She testified that she had panic attacks at home at least once a day. Id. When asked whether she had any physical limitations that would limit her ability to work, Plaintiff said that she had had an "ongoing ear infection in [her] right ear." AR 75. Plaintiff testified that the infection had "cleared up"

16

but she had "a feeling it's going to come back, because it just won't go away." Id. Her ear infection caused pain and "a lot of problems with hearing." AR 77. Plaintiff also had fibromyalgia, which was "constantly" painful and felt like a "burning sensation." AR 76. Plaintiff wore glasses but still had "vision issues." AR 78. She couldn't read a book "to save [her] life" because of her concentration problems. Id.

Abercrombie also testified at the hearing. Abercrombie said that she received Social Security disability benefits for bipolar disorder and was home with her sister during the day. AR 97-98. Abercrombie functioned "at a higher level" than Plaintiff and cared for her "to the best of [her] abilities." AR 98. Abercrombie testified that in the morning, she would "set [Plaintiff] to a task like doing the dishes" but Plaintiff wouldn't do them and Abercrombie would have to do them herself at the end of the day. AR 99. Plaintiff was "scared to death to go out in public" and had "severe panic attacks." Id. Plaintiff had manic episodes at least three times a month, during which she would stay up playing on the computer or cleaning "hysterically." AR 100.

Abercrombie did not think that Plaintiff could perform a "task at work," but she thought "not being around people might be something [Plaintiff] could do." AR 101. Abercrombie believed that Plaintiff would be "the type of employee that is constantly calling in" sick, and she sometimes wouldn't be able to get up for work. AR 102.

### 3.    Analysis

The ALJ found that Plaintiff's medically determinable impairment could reasonably be expected to cause the alleged symptoms, but that Plaintiff and Abercrombie's statements concerning the intensity, persistence and limiting effects of those symptoms were "not entirely credible." AR 36. For the reasons discussed below, the ALJ did not err.

As an initial matter, the ALJ apparently credited much of Plaintiff's

testimony. For example, Plaintiff claimed to be unable to be around a lot of people, AR 73, unable to perform somewhat complicated tasks, like operating a cash register, AR 84, unable to concentrate, and unable to follow spoken directions well, AR 230; the ALJ accommodated those complaints by limiting Plaintiff to simple, repetitive, and nonstressful work away from the public and with minimal contact with coworkers, AR 35.

To the extent the ALJ partially discredited Plaintiff's subjective complaints, she provided a clear and convincing reason for doing so. Specifically, the ALJ found "strong indicators" that Plaintiff's symptoms were "well-controlled with the medication and neither [Plaintiff], nor her physician, thought that further treatment was necessary." AR 36. In support, the ALJ noted that Plaintiff's only treatment consisted of visiting Dr. Deamer once every couple months for medication refills, and that Dr. Deamer repeatedly noted that Plaintiff's symptoms were in "partial remission" and her mood was "stable." AR 36, see also AR 266-67, 310, 342, 354. Plaintiff similarly testified that she visited Dr. Deamer once every three months and that she didn't see a therapist or other mental-health professional. AR 71. As the ALJ also found, AR 36, when Plaintiff reported increased symptoms, her doctor noted that Plaintiff was either not taking her medication regularly, AR 309, or was reacting to the "acute discord" between Plaintiff's sister and brother-in-law, AR 354. Indeed, Dr. Deamer's notes reflect that medication helped Plaintiff's condition. See AR 266, 386. This was a clear and convincing reason for partially discounting Plaintiff's subjective complaints. See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) (explaining that impairments that can be controlled effectively with medication are not disabling for purposes of determining eligibility for benefits); Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998) (as amended Jan. 26, 1999) (in assessing claimant's credibility, ALJ did not err in considering that medication aided the

18

claimant's symptoms).

Nor did the ALJ err in partially discounting Abercrombie's statements. The ALJ found that Abercrombie's testimony was "cumulative to [Plaintiff's] allegations" and like Plaintiff's, it was "not supported by the treatment records showing that [Plaintiff] was well maintained on her medication." AR 37. Because the ALJ properly discredited Plaintiff's complaints and Abercrombie's report and testimony echoed those complaints, the ALJ necessarily gave a germane reason for according limited weight to Abercrombie's statements. See Valentine, 574 F.3d at 694 (holding that because "the ALJ provided clear and convincing reasons for rejecting [claimant's] own subjective complaints, and because [the lay witness's] testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting [the lay witness's] testimony"); see also Molina v. Astrue, 674 F.3d 1104, 1117 (9th Cir. 2012) ("Where lay witness testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony, it would be inconsistent with our prior harmless error precedent to deem the ALJ's failure to discuss the lay witness testimony to be prejudicial per se.").

Remand is not warranted on these grounds.

## C.   The ALJ's RFC Assessment

Plaintiff contends that the ALJ's RFC assessment is not supported by substantial evidence and fails to include all of her functional limitations. JS at 26-34, 43-45. For the reasons discussed below, the Court agrees.

A claimant's "residual functional capacity" is the most a claimant can still do despite her limitations. Smolen, 80 F.3d at 1291. An ALJ will assess a claimant's RFC based on all the relevant evidence of record and will consider all of the claimant's medically determinable impairments, whether found to be severe or not. §§ 404.1545(a)(1)-(2), (e), 416.945(a)(1)-(2), (e). An RFC

19

assessment is ultimately an administrative finding reserved to the Commissioner. §§ 404.1527(d)(2), 416.927(d)(2). However, an RFC determination is based on all of the relevant evidence, including the diagnoses, treatment, observations, and opinions of medical sources, such as treating and examining physicians. Id.

Here, the ALJ accorded the "most weight" to Dr. Goosby's mental-RFC assessment because it was supported by unspecified "medical signs and laboratory findings" and consistent with the record and because Dr. Goosby specialized in psychology. AR 36. But the ALJ nevertheless excluded from the RFC some of Dr. Goosby's specific findings. Most significantly, Dr. Goosby found, as part of her credited RFC assessment, that Plaintiff was "limited to carrying-out . . . simple 1-2 step tasks," AR 150, but the ALJ included in the RFC only a limitation to "simple, repetitive tasks," AR 35, which did not fully encompass Dr. Goosby's finding. See Navarro v. Astrue, No. 10-217, 2010 WL 5313439, at *5 (C.D. Cal. Dec. 16, 2010) (finding that RFC to perform "simple work" did not sufficiently encompass doctor's finding that plaintiff could perform only simple one- to two-step tasks).

Plaintiff also argues that the ALJ failed to include provisions accommodating Dr. Goosby's findings that Plaintiff had moderate limitations in concentration, persistence, and pace; performing activities of daily living; completing a normal workday or workweek without interruption from psychologically based symptoms; and performing at a consistent pace without an unreasonable number and length of rest periods. JS at 29-31 (citing AR 147, 150). In response, Respondent mainly contends that Plaintiff's argument "ignores Dr. Goosby's additional explanation that Plaintiff's limitations would be addressed by simple work and limited contact with the public." Id. at 38-39 (citing AR 147, 150-51). But as discussed above, Dr. Goosby actually opined that Plaintiff's RFC limitations would be accommodated by "simple 1-2 step

20

tasks," not just "simple work." AR 150-51. Remand is therefore warranted based on the ALJ's failure to either discredit Dr. Goosby's excluded findings or incorporate them into Plaintiff's RFC. See §§ 404.1527(e)(2), 416.927(e)(2); SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.").

Plaintiff also contends that the ALJ should have included physical limitations in her RFC based on her poor eyesight, hearing loss, fibromyalgia, and obesity. JS at 31-34. Indeed, Dr. F. Wilson, a state-agency medical consultant, found that Plaintiff's vision loss was severe and resulted in "some mild limitations in clarity of distance and near" visual acuity. AR 146, 149. The ALJ, however, failed to address those findings or include any vision limitations in Plaintiff's RFC. And although the ALJ found that Plaintiff's history of ear infections was nonsevere, AR 33-34, she failed to clearly address the impact of any resulting hearing loss. See AR 317 (doctor noting that Plaintiff had ear infection and hearing loss), 75, 77-78 (Plaintiff testifying that her ear infection had resolved but she still had hearing loss). As such, remand for further findings regarding Plaintiff's poor eyesight and hearing loss is warranted.

As for Plaintiff's fibromyalgia, the record contains only a few brief references to that condition and none of the medical evidence indicates how it was diagnosed or what symptoms it caused. See AR 265 (noting diagnoses of fibromyalgia, prescribing tramadol, and recommending stretching and meditation), 270 (noting diagnosis of fibromyalgia), 355 (same), 372 (same). And as to Plaintiff's obesity, Plaintiff fails to point to any evidence that it resulted in any functional limitations whatsoever. JS at 33-34. As such, it appears that the ALJ did not err in failing to include any RFC limitations

21

based on those conditions. However, on remand, the ALJ may make any additional findings regarding Plaintiff's fibromyalgia and obesity that may be necessary to formulate Plaintiff's RFC.[6]

Remand is therefore warranted on this ground.

**D.    Remaining Issues**

Plaintiff contends that the ALJ posed an "incomplete and inaccurate" hypothetical to the VE and failed to resolve a conflict between the DOT and the VE's testimony. Because remand is warranted based on the ALJ's errors in formulating Plaintiff's RFC, the Court does not reach those remaining issues.[7]

**E.    Remand for Further Proceedings Is Appropriate**

The decision whether to remand for further proceedings is within this Court's discretion. Harman v. Apfel, 211 F.3d 1172, 1175-78 (9th Cir. 2000) (as amended). Where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits. Id. at 1179 (noting that "the decision of whether to remand for further proceedings turns upon the likely utility of such proceedings"); Benecke v. Barnhart, 379 F.3d 587, 593 (9th Cir. 2004).

A remand is appropriate, however, where there are outstanding issues

---

[6] Plaintiff also argues that the ALJ erred by failing to include limitations found by Dr. Deamer. JS at 28. But as discussed above, the ALJ properly discounted Dr. Deamer's opinions regarding Plaintiff's functional limitations; as such, the ALJ was not required to include them in Plaintiff's RFC. See Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not required to incorporate into RFC those findings from treating-physician opinions that were "permissibly discounted").

[7] The Court notes, however, that a limitation to one- and two-step instructions may be incompatible with jobs, such as those identified by the VE, that require level-two reasoning. See DOT, App. C, 1991 WL 688702; Navarro, 2010 WL 5313439, at *5.

that must be resolved before a determination of disability can be made and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated. <u>Bunnell v. Barnhart</u>, 336 F.3d 1112, 1115-16 (9th Cir. 2003); <u>see also</u> <u>Garrison</u>, 759 F.3d at 1021 (explaining that courts have "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act."). Here, remand is appropriate for the ALJ to fully and properly assess Plaintiff's RFC and, if necessary, more fully develop the record regarding Plaintiff's conditions and functional limitations. Thereafter, the ALJ may determine whether Plaintiff can perform jobs that exist in significant numbers in the national economy.

### IV.

### CONCLUSION

For the reasons stated above, the decision of the Social Security Commissioner is REVERSED and the action is REMANDED for further proceedings.

Dated: December 19, 2016

_____
DOUGLAS F. McCORMICK
United States Magistrate Judge